**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| AARON OUTLAW, #353453 | * | |
| Plaintiff | * | |
| v | * | Civil Action No. DKC-11-2915 (Consolidated with DKC-11-3376) |
| KATHLEEN GREEN, Warden JASON CLEM, M.D.[1] | * | |
| MICHAEL BUSH, P.A. BRUCE FORD, P.A. | * | |
| | * | |
| Defendants | | |
| | *** | |

**MEMORANDUM OPINION**

Plaintiff Aaron Outlaw ("Outlaw"), a self-represented prisoner currently housed at Eastern Correctional Institution ("ECI"), has filed thirteen actions in this court in less than three years, eight of which concerned his perceived inadequacies regarding the level of medical services required under the Eighth Amendment.[2] In this, his latest claim, Outlaw alleges Warden Green ("Correctional Defendant") somehow is behind his retaliatory transfer to ECI and is implicated in non-delivery of his mail. The crux of Outlaw's complaint, however, focuses on his claim that Doctor Clem and Physician's Assistants Bush and Ford ("Medical Defendants"), employees of the contractual health care provider at ECI, have failed to provide him the type of necessary medical care he had received at previous prisons, particularly with regard to

---

[1] The Clerk shall amend the docket to reflect the full names of the Medical Defendants.

[2] In addition to the instant consolidated cases, Outlaw has filed *Outlaw v. CMS,* Civil Action No. DKC-09-1704 (D. Md.); *Outlaw v. MDPSCS, et al.*, Civil Action No. DKC-10-1688 (D. Md.), consolidated with Civil Action No. DKC-10-1696 (D. Md.); *Outlaw v. Druckman, et al.,* Civil Action No. DKC-11-1961 (D. Md.); *Outlaw v. Davis, et al.,*  Civil Action No. DKC-11-2038 (D. Md.); *Outlaw v. Stouffer, et al.,* Civil Action No. DKC-11-3040 (D. Md.); and *Outlaw v. Green, et al.,* Civil Action No. DKC-11-3159 (D. Md.).

management of severe and chronic pain. Now pending are unopposed[3] motions to dismiss or for summary judgment filed on behalf of the Correctional Defendant (ECF No. 16) and the Medical Defendants (ECF No. 15) which shall be construed as motions for summary judgment filed pursuant to Fed. R. Civ. P. 56.[4] No hearing is required to resolve the issues presented in the Complaint. *See* Local Rule 105.6 (D. Md. 2011).

## Background

Examination of the February 26, 2012, Memorandum Opinion resolving *Outlaw v. Druckman, et al.,* Civil Action No. DKC-11-1961 (D. Md.),[5] provides a wealth of information relevant to the instant claims. In that civil rights action, filed July 13, 2011, Outlaw sought money against medical staff who treated him during his incarceration at the Maryland Correctional Institution – Hagerstown ("MCI-H"),[6] claiming failure to provide adequate medication to relieve his severe and chronic pain. The record revealed that Outlaw suffers from several serious medical conditions, including a genetic disorder of the bone marrow known as familial polycythemia,[7] chronic pain caused by an old gunshot wound to the lower back, and

---

[3] Pursuant to the dictates of *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975), on February 29, 2012, Outlaw was notified that Defendants had filed dispositive motions, the granting of which could result in the dismissal of his action. ECF No. 17  Outlaw was informed that he was entitled to file materials in opposition to that motion within seventeen (17) days from the date of that letter and that his failure to file a timely or responsive pleading or to illustrate, by affidavit or the like, a genuine dispute of material fact, could result in the dismissal of his case or in the entry of summary judgment without further notice of the court. *Id.* To date, he has failed to respond.

[4] The dispositive submission will be treated as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure because materials outside the four corners of the document have been considered. *See Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

[5] Citation to that record is found in the Memorandum Opinion and shall not be reiterated here.

[6] Outlaw was transferred from MCI-H to ECI on August 3, 2011.   ECF No. 15, Affidavit of Jason Clem, M.D., Exhibit 2, ¶ 1.

[7] The disorder causes overproduction of red blood cells and thickening of the blood.  Treatment includes bloodletting (phlebotomy) to keep the red blood cell count below certain levels.  Plaintiff does not have "blood cancer."

traumatic injury to the right hip and leg, for which treatment included surgical repair and internal hardware placement.  Outlaw also suffers from psychiatric disorders.[8]

Prior to his transfer to MCI-H in July of 2010, Outlaw was under the care of Jessup Correctional Institution ("JCI") medical personnel as well as Dr. Cornell Shelton, a pain management specialist practicing at Bon Secours Hospital in Baltimore.  Dr. Shelton examined Outlaw for complaints of chronic pain on March 18, 2010, noted Outlaw's history of heroin abuse, including heroin use on January 4, 2010, and nonetheless recommended chronic pain medications, including the opioid MS Contin,[9] 30 mg. every twelve hours, Lyrica (also known as pregabalin, a medication used to treat neuropathic pain often associated with diabetes or fibromyalgia),[10] and Zanaflex (a short-term medication used as a muscle relaxant and pain reliever).[11]  Physical therapy also was recommended.

At the time of transfer to MCI-H, Outlaw was receiving various pain medications, including Nubain,[12] MS Contin,[13] and Tylenol with codeine.  On August 5, 2010, Dr. Druckman first examined Outlaw in conjunction with a "pain management review."  Druckman, who had treated Outlaw in the past, determined that x-rays and examination did not support Outlaw's

---

[8] Outlaw's other health concerns, including diagnosis and treatment for a kidney stone, mental health care, asthma, hematuria (blood in the urine) and his blood disorder were not at issue in the previous case, except to the extent these conditions may have contributed to his complaints of chronic pain.  Outlaw's claim of an Eighth Amendment violation primarily centered on changes to prescribed pain medications that occurred subsequent to his transfer from JCI to MCI-H in July of 2010.  He repeats this type of claim in the matter now before this court.

[9] *See* http://www.drugs.com/oxycodone.html.

[10] *See* http://www.pfizerpro.com/hcp/lyrica.

[11] *See* http://www.drugs.com/zanaflex.html.

[12] Nubain is a potent injected synthetic opiod analgesic similar to oxymorphone.  *See* http://www.drugs.com/pro/nubain.html.  It appears Outlaw was first prescribed Nubain at the time of transfer to MCI-H.  The medication was not available between July 31 and August 5, 2010, because it was on back-order; it appears, however, that Outlaw received the medication once it again was made available.

[13] The dosage of this drug had been reduced from the 30 mg. recommended by Dr. Shelton to 15 mg.

"atypical pain pattern" and Outlaw was engaging in "drug seeking behavior." Druckman advised Outlaw that he would receive no additional pain medication but would be provided Ms Contin, Nubain and Naproxen.[14]

On August 9, 2010, Outlaw was transferred to Metropolitan Transition Center (MTC) and then to Maryland Reception Diagnostic and Classification Center (MRDCC). Outlaw returned to MCI-H on December 23, 2010, with a current prescription for MS Contin at a daily dosage of 60 mg. This prescription was continued by Druckman. During January, 2011, Outlaw complained of blood in his urine but denied abdominal discomfort. Irregularities led medical personnel to conclude Outlaw had altered the urine specimen. An enema was given to relieve constipation. On January 31, 2011, Dr. Colin Ottey admitted Outlaw to the MCI-H Infirmary for complaints of abdominal pain. All medications were continued while the cause of the problem was explored.

On February 1, 2011, Druckman examined Outlaw in the Infirmary and concluded that ileus (bowel obstruction) due to a recent increase in his morphine dosage could not be ruled out. Abdominal x-rays supported this clinical impression. On February 3, 2011, Druckman examined Outlaw in the Infirmary and found him hypersensitive to light touch on his abdomen. Laboratory testing showed polycythemia. Urine showed blood, but a dipstick specimen obtained the day before was negative. Druckman ordered a urine culture and continued all medications. Druckman also submitted a consultation request to Wexford[15] for a CT scan of Outlaw's kidneys

---

[14] Naproxen is a non-steroidal anti-inflammatory drug (NSAID) used to treat pain associated with joint and muscular problems.  *See* http://www.bing.com/health/article/goldstandard-GS80421/Naproxen-and-naproxen-sodium-oral-immediate-release-tablets?q=naprosyn&qpvt=Naprosyn.

[15] Wexford is the utilization review contractor for the State of Maryland. Wexford reviews and must approve all requests by on-site and off-site consultants for certain medical devices and tests. The medical providers, however, are employees of Corizon, Inc., f/k/a Correctional Medical Services, Inc. ("CMS"), are not affiliated with Wexford, and are not involved in the approval process.

to rule out recurrent kidney stones as a cause for his abdominal pain.[16] On February 4, 2011, Druckman informed Outlaw that pain medications would continue until it was determined if he had kidney stones. Druckman also indicated that the abdominal pain was most likely due to his pain medications and that the reported symptoms exceeded the objective information found upon examination. Outlaw, however, insisted that he had massive kidney stones. Nubain and all other pain medications were continued.

On February 8, 2011, Druckman examined Outlaw and reviewed urine culture results showing polymicrobial growth, which indicated likely contamination or adulteration of the urine sample. Druckman told Outlaw of the need to collect a urine sample from a catheter. Outlaw refused because of the pain associated with placing a catheter, but later agreed. All pain medications were continued. At that time Outlaw was receiving morphine and Nubain.

On February 15, 2011, Outlaw complained that he had not yet received his Nubain at the time Druckman made his rounds. Druckman decreased the dose of MS Contin from 60 mg. to 45 mg daily and ordered phlebotomy for the next day. On February 23, 2011, a CT scan was completed at Bon Secours Hospital. The results were unremarkable; no kidney stones were seen and there was no evidence of colitis or diverticulitis. Outlaw was determined to be constipated, which is a known side effect of MS Contin.

On March 1, 2011, Outlaw first complained of right hip pain. Nubain was discontinued, but all other medications were administered. An x-ray was unremarkable. Outlaw requested that his MS Contin dose be increased to 60 mg. due to his hip pain. Medical personnel opined that Outlaw had an opioid dependence. Additional x-rays of Mr. Outlaw's lower back and right knee were ordered in response to new complaints of pain in these areas. These, too, were unremarkable.

---

[16] The consultation was approved and took place on February 23, 2011.

On March 7, 2011, Druckman examined Outlaw in response to complaints of pain all over his body. Outlaw answered "I don't know" to specific inquiries about the pain, showed no signs or symptoms of pain, and asked for more MS Contin. Druckman found Outlaw was drug-seeking and ordered a repeat phlebotomy which was given the following day. Outlaw then asked that his MS Contin dosage be increased to 60 mg. for neck and back pain. Druckman found no objective evidence of pain and told Outlaw that his MS Contin dosage could not be increased without consensus from multiple disciplines. A March 11, 2011, examination revealed tenderness and right paraspinal spasm and sciatic notch tenderness. Druckman ordered a trial of Zanaflex to address the complaints of pain in the back and right leg.

On March 14, 2011, Outlaw stated that his pain was at a 9/10. A physician's assistant noted "[t]here is absolutely no s/s or any kind of distress or discomfort. He is relaxed to the point of falling asleep. He does not wince or grimace. He is not restless or agitated. Breathing is slow, even and unlabored." His medications, including MS Contin, were continued. The following day, Druckman examined Outlaw, prescribed Plavix, and ordered phlebotomy as adjunctive care in the treatment of polycythemia. Outlaw reported that the Zanaflex was helping his back spasms. MS Contin, at 45 mg. daily, was continued. On March 18, 2011, Outlaw was discharged from the infirmary. It was noted that his constipation had resolved when his dosage of MS Contin decreased. At time of discharge Outlaw had complaints of chronic low back pain related to his past gunshot wound. Zanaflex was administered with MS Contin to treat the pain. Outlaw voiced no complaints since the adjustment of his medication.

Druckman submitted a consultation request to Wexford for a CT of the spine which was approved. The CT scan was initially scheduled for April 20, 2011. Plaintiff declined. The CT

6

was re-scheduled and completed on July 7, 2011. No fracture, degenerative change, or stenosis was observed. On April 27, 2011, Outlaw refused to have his blood drawn.

MS Contin is administered at MCI-H on a "watch take" status, meaning the patient is observed taking the medication and his mouth inspected after ingestion. On April 29, 2011, medical staff charted the following:

> Patient has been on MS contin for awhile and he has been noted to cheek his medication on medline. Case discussed with Dr. Druckman and he recommend switching the patient to 15 mg of methadone BID. Narcotic form filled out today and given to pharmacy nurses. Correct RX notified and methadone does not require a nonformulary. Pharmacy Nurses: Please D/C MS Contin when methadone arrives!

Druckman replaced Outlaw's MS Contin[17] with an equivalent dose of methadone, which can be administered by dissolving it in liquid. Before doing so, Druckman consulted with Dr. Shelton, Outlaw's "outside" pain management specialist, who agreed both with the substitution of methadone for MS Contin and with the dosage. Druckman left his position at MCI-H on May 30, 2011. On August 3, 2011, Outlaw was transferred to ECI.

Within ten weeks of transfer to ECI, Outlaw brought the instant action. In addition to allegations against the Warden, Outlaw claims that Dr. Clem periodically denied him pain medication and ignored his pain complaints; that P.A. Bush failed to order adequate pain medication; and that P.A. Ford took away his cane. At the time he was transferred to ECI, Outlaw had been diagnosed with opioid dependency, chronic pain, familiar polycythemia and backache. His medications upon transfer included Tizamidine (Zanaflex), amitriptyline (Elavil), albuterol and methadone. ECF No. 15, Affidavit of Jason Clem, M.D., Exhibit 2, ¶ 3. He was angry and aggressive toward the nurse who met with him to perform an intake review of his

---

[17] MS Contin is an extended release tablet that must be taken as a whole tablet.

medical history and correctional staff placed him in secure housing on Housing Unit 4 in a Level 1 cell. His medications, including methadone, were administered to him that evening as ordered by the transferring institution, MCI-H. *Id.,* Exhibit 2, ¶ 4; Exhibit 1 at 1-6.

Outlaw was examined by Dr. Paul Matera on August 4, 2011, to determine his housing placement while on methadone. Matera noted Outlaw walked without difficulty but had a cane. Outlaw reported pain on a scale of 10 out of 10, but had no signs of distress, leading Matera to conclude that Outlaw was magnifying his symptoms. Matera ordered Outlaw admitted to the prison infirmary so that he could be weaned off methadone and treated for dehydration. Ultram would then be administered for pain beginning August 8, 2011. Zanaflex was to be discontinued after 72 hours and replaced with Robaxin, another type of muscle relaxant. *Id.,* Exibit 2, ¶5, Exhibit 1 at 16-22.

Outlaw was escorted to the infirmary by correctional officers; several officers remained in the medical unit due to Outlaw's aggressive and threatening behavior. Prison security staff ordered the bed be removed from the cell (the mattress was placed on the floor) and expressed concerns about the presence of an IV pole in Outlaw's cell. Outlaw later removed his IV with his teeth; it was reinserted by medical personnel. *Id.,* Exibit 2, ¶6; Exhibit 1 at 22. Outlaw remained in the infirmary until August 11, 2011, during which time he was monitored by nurses and examined by physicians and physician's assistants.[18] Plaintiff was described several times as ambulating without difficulty during his infirmary admission.

On August 5, 2011, Dr. Clem examined Outlaw and informed him that ECI policy did not allow opioids outside of the infirmary and they could not be kept on his person. Outlaw was also told that his condition did not warrant full time care in the infirmary and that he was being

---

[18] These rounds are described in detail in ECF No. 15, Exhibits 1 and 2. *Id.,* Exhibit 2, ¶¶ 7-15.

weaned off of narcotics: methadone would be replaced with Ultram (tramadol), a narcotic-like medication that sometimes is habit-forming and is used to treat moderate to severe pain. Outlaw was clearly unhappy after this discussion and asked to be transferred to another facility. *Id.*, Exibit. 2, ¶ 8; Exhibit 1 at 27-28.

On August 6, 2011, P.A. Maryam Messforosh recorded that Outlaw was demanding MS Contin and stated he was experiencing pain without it. She also observed that he had no difficulty walking. *Id.,* Exibit 2, ¶ 9; Exhibit 1 at 38. On August 7, 2011, Outlaw informed P.A. Jessica Cecil that he would refuse phlebotomy for treatment of his familial polycythemia and that he would only go to a licensed facility, despite the fact that phlebotomy can be done in any facility where blood can be drawn, including the infirmary at ECI. *Id.,* Exhibit 2, ¶10; Exhibit 1 at 42. The following day, Outlaw's blood was drawn and sent to the laboratory for a complete blood count and other procedures. The results showed his hemtocrit (HCT) was 59.4; typically, he received phlebotomy when his HCT was above 55. *Id.,* Exhibit 2, ¶11; Exhibit 1 at 60, 68.

On August 8, 2011, Dr. Vincent Siracusano, a psychiatrist, saw Outlaw for medication management. Plaintiff made no psychiatric complaints. Elavil was continued for treatment of his depression and management of his other psychiatric conditions. *Id.,* Exhibit 2, ¶12; Exhibit 1 at 48-54. Dr. Clem examined Outlaw again on August 9, 2011, and noted minimal withdrawal symptoms and continued complaints of pain. Outlaw also denied having symptoms of polycythemia, despite his elevated HCT. No hematuria (blood in the urine) was reported. A nurse noted during later rounds that Outlaw was agitated and a correctional officer was called to the infirmary at that time. *Id.,* Exhibit 2, ¶13; Exhibit 1 at 63.

On August 10, 2011, Dr. Clem examined Outlaw in the infirmary and noted the completion of the methadone wean. Plaintiff was agitated but had no withdrawal symptoms and

indicated Ultram was moderately helpful with his pain. No hematuria was reported. Dr. Clem ordered phlebotomy, pending input from a hematologist. Dr. Clem spoke with a hematologist who concurred with phlebotomy for treating familial polycythemia and relayed this information to Dr. Matera. Nurses again noted Outlaw walking around the infirmary without difficulty. *Id.,* Exhibit 2, ¶14; Exhibit 1 at 70, 81.

Outlaw was discharged from the infirmary on August 11, 2011. He refused phlebotomy before discharge on the grounds that he wanted to go to an outside facility for the treatment. No hematuria was reported. Dr. Matera requested a hematology consultation from Wexford for phlebotomy at an outside facility. Dr. Matera saw Outlaw walking without difficulty. He scheduled Outlaw for continued care in the Chronic Care Clinic ("CCC"). *Id.,* Exhibit 2, ¶15; Exhibit 1 at 73-81. Outlaw signed a release of responsibility documenting his refusal of phlebotomy. *Id.,* Exhibit 2, ¶16; Exhibit 1 at 86.

On August 16, 2011, Dr. Lino Quilo examined Outlaw in the CCC and noted that he had no complaints relating to polycythemia or hematuria. Dr. Quilo ordered that he be maintained on Ultram for pain, ordered complete laboratory work and submitted a non-formulary drug request for a 120-day supply of Ultram.[19] *Id.,* Exhibit 2, ¶17; Exhibit 1 at 87-91.

Outlaw wrote numerous sick call requests in September and October 2011; these requests prompted responses from a triage nurse or a physician's assistant. *Id.,* Exhibit 2, ¶18. On September 8, 2011, Outlaw wrote two sick call slips, first requesting to see a pain management specialist because Ultram was not working. His second sick call slip referenced a hole in his tooth. Outlaw received dental care on September 15 and October 18, 2011. *Id.,* Exhibit 2, ¶¶ 19 and 21; Exhibit 1 at 105, 108-110. On September 13, 2011, Outlaw told Defendant Bush he

---

[19] CMS does not maintain a supply of non-formulary medications on the premises and orders them in a specific quantity for particular patients. *Id*.

wanted to see a pain management specialist, wanted a prescription for MS Contin, and intended to sue until he was transferred to a medical institution. He also reported that he had not received Ultram. Bush noted Outlaw was agitated and incoherent during the encounter; re-submitted a non-formulary request for Ultram; and referred Outlaw to a physician. Bush wrote, "[t]here is nothing I can do for him at this time. His issues are logistic in prison placement, and his chronic pain is already managed by CCC." *Id.,* Exhibit 1 at 106-107; Exhibit 2, ¶20. On September 16, 2011, Dr. Clem approved a non-formulary request for a 120-day supply of Ultram for Outlaw.[20] The medication arrived at ECI on September 20, 2011, and was administered that same day. *Id.,* Exhibit 2, ¶¶ 23-24; Exhibit 1 at 114-116.

On September 20, 2011, Plaintiff submitted another sick call slip complaining of hematuria lasting more than a month. *Id.,* Exhibit 2, ¶25; Exhibit 1 at 115. On September 21, 2011, Outlaw was seen for medication management by Dr. Reeves, a psychiatrist, who renewed Outlaw's prescription for Elavil. That same day, Outlaw submitted another sick call slip complaining of pain throughout his body. *Id.,* Exhibit 2, ¶¶ 26-27; Exhibit 1 at 112. On September 23, 2011, Outlaw submitted another sick call slip requesting to see a pain management specialist and indicating Ultram did nothing for his pain. *Id.,* Exhibit 2, ¶28; Exhibit 1 at 126. Three days later, he prepared an Informal Inmate Complaint Form against Clem to the Warden, claiming that he was hypersensitive to Ultram and it caused his skin to break out. He also stated that Clem refused to change his medication and "is denying me proper medical care out of some personal dislike for me because I have wrote him up a number of

---

[20] Outlaw submitted two sick calls on September 15, 2011, complaining of extreme pain lasting 45 days and stating that Clem failed to renew his Ultram and did not substitute another medication. Outlaw stated in his second sick call that he had not received pain medication for seven days and again threatened a lawsuit. *Id.,* Exhibit 2, ¶22; Exhibit 1 at 111.

times." This was Outlaw's first complaint that he was allergic to Ultram. *Id.,* Exhibit 2, ¶29; Exhibit 1 at 127-128.

On September 28, 2011, Outlaw submitted three sick calls complaining that Ultram was causing him to break out, requesting a change in medication, and complaining of hematuria. *Id.,* Exhibit 2, ¶30; Exhibit 1 at 129-131. The next day he was seen in his cell by a nurse and later had a nurse attend a scheduled sick call visit. He reported to the nurse that he was supposed to be receiving MS Contin, not Ultram, and that his skin was itching and broken out. He was told that he could not have Ultram until he was seen by a doctor because he claimed to have an allergic reaction to it. *Id.,* Exhibit 2, ¶32; Exhibit 1 at 132-133. Bush responded to a sick call request on September 29, 2011, at which time Outlaw requested that more be done for his pain and stated that Ultram caused him to break out in a rash. Bush discussed pain medications and stated that he would not be prescribed narcotics. Bush referred Outlaw to the chronic pain clinic, discontinued Ultram because of Outlaw's reported allergy, and ordered an abdominal x-ray in response to his complaints of hematuria. The x-ray was negative for kidney stones. *Id.,* Exhibit 2, ¶32; Exhibit 1 at 135-136.

On September 29, 2011, Outlaw submitted a sick call slip requesting to see Dr. Clem about pain. Ex. 2, ¶ 33. On September 30, 2011, Outlaw submitted another sick call request to see Dr. Clem about his pain medication and yet another sick call slip requesting renewal of his Zanaflex prescription. *Id.,* Exhibit 2, ¶ 34; Exhibit 1 at 140-141. On October 1, 2011, Outlaw submitted a sick call slip requesting phlebotomy, which he previously had refused to have done "in house" at ECI. At that time, the request for a hematology consult was still pending with Wexford. Plaintiff submitted a second sick call on October 1, 2011, complaining that the medical department failed to properly medicate him. *Id.,* Exhibit 2, ¶ 35; Exhibit 1 at 144-145.

On October 1, 2011, Outlaw refused a refill of ibuprofen. Outlaw refused robaxin and pain medication on October 2 and October 3, 2011. *Id.,* Exhibit 2, ¶ 38; Exhibit 1 at 148. On October 2, 2011, Mr. Outlaw submitted a sick call complaining of hematuria lasting one week. *Id.,* Exhibit 2, ¶ 36; Exhibit 1 at 146. On October 3, 2011, Outlaw submitted another sick call complaining that he was in pain. *Id.,* Exhibit 2, ¶37-38; Exhibit 1 at 147. The following day, Bush responded and found Outlaw agitated. Bush explained to him that he could not have his desired narcotic medications, which caused further agitation. Outlaw requested Ultram and Zanaflex, but was told that Ultram could not be prescribed due to his allergy. Outlaw threatened to punch Bush at the end of the consultation. Outlaw refused all of his medications, including Elavil, after Ultram was discontinued on October 4, 2011. *Id.,* Exhibit 2, ¶¶ 39-40; Exhibit 1 at 149-150.

On October 5, 2011, psychiatrist Dr. Reeves had a medication management appointment with Outlaw, recording he was refusing Elavil for depression. Dr. Reeves wrote, "The PA (Bush) stopped his Ultram and now Mr. Outlaw has declared war on the world. He threatened PA Bush and now is [refusing] all medications. At his request I have him on Elavil and he is refusing that -- since Ultram was stopped. Talk about cutting off your nose to spite your face!" Dr. Reeves further noted, "the patient expresses homicidal ideation." *Id.,* Exhibit 2, ¶ 41; Exhibit 1 at 152.

On October 11, 2011, P.A. Bruce Ford examined Outlaw for the first time and observed "patient walks into the room with a normal gait, no limp, reclines into the chair and moves about with no difficulty or signs of discomfort." Outlaw requested medications he had received while at other facilities, specifically MS Contin, Nubain and Zanaflex. Ford offered Neurontin and Outlaw responded that was "no good." Ford informed him that Neurontin would be ordered and

it was his decision to take it or not. Ford also discussed with Outlaw his wishes for an appointment at the University of Maryland with him. *Id.,* Exhibit 2, ¶ 43; Exhibit 3, Affidavit of Bruce Ford, ¶ 3; Exhibit 1 at 160-163.

On October 13, 2011, Ford saw Outlaw again to discuss a possible appointment at an outside facility and told him that he would be sent to Bon Secours for treatment of polycythemia. Ford did a lengthy chart review, and after discussing the matter with nursing and security staff, discontinued the order for a cane, as Outlaw had a normal gait without the cane and there were concerns for the safety of inmates and staff. Upon leaving the consultation, Outlaw threw himself on the floor and claimed to be paralyzed. Ford examined him, found no signs of trauma and instructed him to return to his cell. Ford wrote, "Patient very agitated and angry when he left the exam room. Patient is clearly acting out again in an attempt to keep his cane and obtain additional pain medications." *Id.,* Exhibit 2, ¶ 44; Ex. 3, ¶ 5; Exhibit 1 at 164.

On October 13, 2011, Ford submitted a non-formulary request form for Neurontin (gabapentin) as a pain medication; the request was approved by Dr. Clem. *Id.,* Exhibit 2, ¶ 44; Ex. 3, ¶ 7; Exhibit 1 at 161-162, 165. On October 17, 2011, Ford diagnosed Outlaw with a urinary tract infection and prescribed Bactrim, an antibiotic, for treatment. *Id.,* Exhibit 2, ¶ 46; Ex. 3, ¶ 8; Exhibit 1 at 167. That same day, Outlaw complained that he had been assaulted and strangled. Upon examination, there was no bruising or swelling of his neck and throat. Outlaw had no difficulty swallowing and was released to custody. *Id.,* Exhibit 2, ¶ 45; Exhibit 1 at 166.

**Standard of Review**

Rule 56(a) & (c) of the Federal Rules of Civil Procedure provides:

> A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to

> any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.
>
> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

This does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

The party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the moving party has met that burden, the non-moving party must come forward and demonstrate that such an issue does, in fact, exist. *See Matsushita Elec. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). "The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)); *see also Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240 (4th Cir. 1988).

The court generally must view all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Scott v. Harris,* 550 U.S. 372, 376-77 (2007).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Id.* at 380.

**Analysis**

The court will first examine Outlaw's claims against the Medical Defendants. The government is "obligat[ed] to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). When contractual prison health care providers show "deliberate indifference" to a prisoner's "serious medical needs," their actions or omissions give rise to an Eighth Amendment violation. *Id.* at 104. The named individual "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The medical treatment provided must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. *See Miltier v. Beorn,* 896 F.2d 848, 851 (4th Cir. 1990).

In alleging a denial of his Eighth Amendment right to necessary medical care, Outlaw must prove two essential elements. First, he must satisfy the objective component by illustrating a serious medical condition. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995); *Johnson v. Quinones,* 145 F.3d 164, 167 (4th Cir. 1998). If he proves this first element, Outlaw must then prove the second subjective component of the Eighth Amendment standard by showing deliberate indifference on the part of Defendants. *See Wilson v. Seiter*, 501 U.S. 294, 303 (1991) (holding that claims alleging inadequate medical care are subject to the "deliberate indifference" standard outlined in *Estelle*, 429 U.S. at 105-06). "[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S.

825, 835 (1994). Medical personnel "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id*. at 837. Medical staff are not, however, liable if they "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id*. at 844; *see also Quinones*, 145 F.3d at 167.

Mere negligence or malpractice does not rise to a constitutional level. *See Miltier,* 896 F.2d at 848; *see also Short v. Smoot*, 436 F.3d 422, 427 (4th Cir. 2006) (quoting *Farmer*, 511 U.S. at 835). An inmate's disagreement with medical providers about the proper course of treatment does not support an Eighth Amendment cause of action. *See Wright v. Collins,* 766 F.2d 841, 849 (4th Cir. 1985); *Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977); *Russell v. Sheffer*, 528 F.2d 318 (4th Cir. 1975).

Here, ECI medical personnel, including the named Defendants weaned Outlaw, a former heroin user, from potent and addictive opioid-based medications after his transfer from MCI-H. Non-narcotic pain medications were substituted after medical personnel assessed Outlaw's needs and determined that his exaggerated reports of extreme pain were merely part of his drug-seeking behavior. Dental care and treatment for a urinary tract infection were provided. Due to his own behavior, Outlaw did not allow medical personnel to perform blood-letting needed to alleviate his blood disorder. The Medical Defendants clearly were not deliberately indifferent to Outlaw's medical needs.

Outlaw's claims against Correctional Defendant Green fare no better. Any claim that Outlaw's transfer from MCI-H to ECI was undertaken in retaliation for his lawsuits against MCI-medical personnel at MCI-H is specious, given that Outlaw himself requested transfer. ECF No. 16, Exhibit 2, Declaration of Jacquelene Shank, ¶ 3 and attached Case Notes at 3. He fails to

specify how Warden Green is involved in an alleged disruption of delivery of his mail, and in any event, Outlaw's claims concerning ECI mail delivery are before this court in another action, *Green v. Jones, et al.,* Civil Action No. DKC-11-3511 (D. Md.), and will not be considered here. Correctional Defendant Green is entitled to summary judgment.

## Conclusion

As noted above, Outlaw's claim of interference with mail is the subject of another lawsuit. In short, Outlaw received adequate medical care for all of his health needs, including pain management, and has failed to establish retaliatory transfer. Nothing more is constitutionally required, and Defendants' dispositive motions are hereby granted. A separate Order shall be entered in accordance with this Memorandum Opinion.

Date:   June 1, 2012                             /s/
                                    DEBORAH K. CHASANOW
                                    United States District Judge